# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

RAMEL M. TOWNS,

                           Plaintiff,                  1:16-cv-01545 (BKS/DJS)

v.

NEW YORK STATE TROOPER THERESA
STANNARD, INVESTIGATOR WILLIAM SHEA,
SENIOR INVESTIGATOR KARL MEYBAUM,
TROOPER MATTHEW CARNIGLIA, and TROOPER
TIMOTHY MALLORY,

                           Defendants.

---

**Appearances:**

*For Plaintiff:*
Lewis B. Oliver, Jr.
Oliver Law Office
156 Madison Avenue
Albany, New York 12202

*For Defendants:*
Letitia James
Attorney General of the State of New York
Colleen D. Galligan
Assistant Attorney General
The Capitol
Albany, New York 12224

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff Ramel M. Towns brings this action under 42 U.S.C. § 1983 alleging that New

York State Troopers Theresa Stannard, Matthew Carniglia, Timothy Mallory, Senior Investigator

Karl Meybaum, and Investigator William Shea (collectively "Defendants"), violated his

constitutional rights when they detained and searched him following a traffic stop on September 8, 2014 in Warren County, New York. (Dkt. No. 1).[1] Plaintiff alleges that Defendants subjected him to illegal detention and unreasonable search and seizure in violation of the Fourth Amendment and racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. (Dkt. No. 1, Claims 1, 5, and 9).

Presently before the Court are the parties' cross-motions for summary judgment. (Dkt. Nos. 40, 41). Defendants move for summary judgment on all of Plaintiff's claims. (Dkt. No. 40). Plaintiff moves for partial summary judgment on his Fourth Amendment claims for (1) illegal detention and (2) unlawful search and seizure. (Dkt. No. 41).

For the following reasons, Defendants' motion is granted as to the equal protection claim and otherwise denied, and Plaintiff's motion is denied.

## II.    FACTS[2]

### A.    The Traffic Stop

On September 8, 2014, at approximately 10:00 a.m., Plaintiff and James Hairston, both African American, were traveling in a Pontiac Grand Am north along Interstate 87 ("the "Northway"), from the Bronx, New York to Burlington, Vermont (Dkt. No. 45-1, ¶¶ 1–3; Dkt. No. 41-2, ¶ 1). While Plaintiff disputes Defendants' assertion that radar clocked the vehicle's speed at 80 mph, Plaintiff, who was in the passenger seat, concedes that the Pontiac "may have been a few miles [per hour] . . . above the speed limit." (Dkt. No. 45-1, ¶ 4; Dkt. No. 40-2, ¶ 6; Dkt. No. 43-1, at 100–01). Defendant Stannard was parked "in a 'very short U-turn' between the

---

[1] The claims are brought against the Defendants in their individual capacities. (Dkt. No. 15, at 15).

[2] The facts are drawn from the parties' statements of material facts, (Dkt. Nos. 40-1; 41-2), their responses thereto (Dkt. Nos. 45-1; 44-1), and the attached affidavits, declarations, exhibits, and depositions. For each party's summary judgment motion, the facts are taken in the light most favorable to the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

north and southbound lanes" of the Northway. (Dkt. No. 43-2, at 24). Stannard was "probably twenty-five to thirty feet" from the Pontiac when she "pulled onto the northbound lanes of the Northway, caught up with the car, and pulled it over for speeding." (Dkt. No. 45-1, ¶ 6). According to Plaintiff, considering the short distance and the daylight hours, the fact that Stannard was allegedly trained to "estimate the speed of passing cars without use of a radar or laser speed gun," she "would be able to determine the race or skin color of the occupants of a vehicle." (Dkt. No. 45-1, ¶ 6). Stannard denies being "able to observe the race, ethnicity, or skin color of the occupants of the vehicle as it passed [her]." (Dkt. No. 40-2, ¶ 7).

After Stannard pulled over the Pontiac, she asked Hairston for his license and registration. (Dkt. No. 45-1, ¶ 7). After Hairston provided his license, Stannard asked "where he was going." (Dkt. No. 40-2, ¶ 9). Hairston replied that "he was driving [Plaintiff] up to Vermont," (Dkt. No. 43-2, at 32, 42), but that "[h]e did not know where in Vermont" and that "the passenger was telling him where to go." (Dkt. No. 40-2, ¶ 9). Stannard "ran Hairston's license and registration and discovered that his license was suspended and that his registration had lapsed for lack of insurance." (*Id.* ¶ 10). Stannard returned to the vehicle, "explained that [Hairston's] license was suspended," and advised Hairston that he would be arrested for aggravated unlicensed operation of a motor vehicle and taken to court for arraignment. (Dkt. No. 45-1, ¶ 9; Dkt. No. 40-2, ¶ 11).

Stannard then asked Plaintiff for his identification; Plaintiff, who did not have a driver's license, provided his "New York State issued Non-Driver Identification." (Dkt. No. 45-1, ¶¶ 10–11). According to Stannard, approximately fifteen minutes had passed from when she "saw Hairston speeding" until she asked Plaintiff for identification. (Dkt. No. 40-2, ¶ 14). During that time, she became suspicious that they might be engaged in some type of criminal activity

because "[t]he driver and the passenger did not really know each other, the driver did not know where they were going in Vermont, they provided conflicting information and they seemed to have no purpose for their trip." (*Id.* ¶ 14). Stannard asserts that Hairston and Plaintiff "exhibited suspicious behavior" because "Hairston was not a taxi driver or anything like that" and because driving from the Bronx to Vermont "is not really a quick trip." (Dkt. No. 43-2, at 42–43). Plaintiff disputes that there was any conflicting information provided and denies that they had provided no reason for their trip.[3]

Next, Stannard requested assistance from New York State Troopers. (Dkt. No. 45-1, ¶ 19; Dkt. No. 40-2, ¶ 16). According to Stannard, she needed assistance to transport Plaintiff off the Northway while she transported Hairston to the barracks to be processed, because pedestrians are prohibited from walking along the highway. (Dkt. No. 40-2, ¶¶ 16–17). While she waited for assistance, Stannard processed the tickets she issued to Hairston for his traffic infractions. (Dkt. No. 45-1 ¶ 25; Dkt. No. 40-2, ¶ 18). Hairston and Plaintiff remained in the front seats of the vehicle. (Dkt. No. 45-1, ¶ 20).

Defendants Shea, Maybaum and Mallory arrived approximately 15 to 20 minutes after Stannard's request for assistance. (Dkt. No. 45-1, ¶ 26; Dkt. No. 40-2, ¶ 19; Dkt. No. 40-6, ¶ 4). Stannard informed the responding officers that she had stopped the Pontiac for speeding and "discovered the driver's license was suspended" and "the vehicle registration had lapsed." (Dkt. No. 45-1, ¶ 27). Shea approached Hairston, "asked him basic questions, such as where he was headed, and had the impression he was not truthful." (Dkt. No. 40-3, ¶ 8).[4] Stannard and Shea

---

[3] At some point Stannard ran Plaintiff's identification and discovered that Plaintiff was on probation in Bronx County, which Plaintiff confirmed to her. (Dkt. No. 45-1, ¶¶ 13–14). The record does not reflect when this occurred; Stannard alleges that she became suspicious of criminal activity before asking Towns for identification. (*Id.* ¶ 14).

[4] Shea does not explain what left him with "the impression that [Hairston's]' responses were not truthful." (Dkt. No. 40-3, ¶ 8).

arrested and searched Hairston. (*Id.* ¶¶ 29–30). Plaintiff remained in the passenger seat of the vehicle while Hairston was searched and arrested. (Dkt. No. 45-1, ¶ 31).

At this point, according to both Mallory and Plaintiff, Shea questioned Plaintiff about his trip. (Dkt. No. 40-6, ¶ 9; Dkt. No. 45-3, ¶ 10). Here, the parties' versions of events diverge. Plaintiff states that after he was questioned by Shea, "approximately 30-40 minutes after the traffic stop began," Shea ordered Mallory to "handcuff[] [Plaintiff] with [his] hands behind [his] back." (Dkt. No. 45-3, at ¶¶ 10–11). Plaintiff was then "removed from the [Pontiac], patted-down," and told to sit on the front of a trooper's car. (Dkt. No. 42-2, at 109). Plaintiff asserts that he remained handcuffed until his arrest at 1:48 p.m. (Dkt. No. 45-3, ¶ 11; Dkt. No. 45-1, ¶ 61). Plaintiff asserts that the way in which he was handcuffed caused him "significant wrist and shoulder pain," and that his request to have his hands cuffed in front were denied, along with requests for water and to use the bathroom. (Dkt. No. 45-3, ¶ 19). According to Defendants, however, while Plaintiff was talking with Shea, he was outside, not in a car, and not handcuffed. (Dkt. No. 40-6, ¶¶ 9–10). The parties agree that Plaintiff was placed in Mallory's patrol car before the inventory search of the Pontiac but dispute whether he was handcuffed at that time. (Dkt. No. 45-1, ¶ 32; Dkt. No. 40-6, ¶ 10).

## B.      The Search of the Pontiac

Stannard and Shea conducted an inventory search of Hairston's Pontiac incident to Hairston's arrest and in anticipation of towing the car from the Northway. (Dkt. No. 45-1, ¶ 33).[5] The inventory search occurred from approximately 11:15 a.m. until 12:05 p.m. (*Id.*). Defendants state that they found "marijuana shake" in the vehicle and detected the smell of marijuana during

---

[5] The parties agree that the vehicle had to be towed because neither Hairston nor Plaintiff had a valid driver's license. (Dkt. No. 45-1, ¶17). Stannard stated that their standard procedure is to inventory vehicles before they are towed in order to protect the personal property contained in the vehicle. (Dkt. No. 40-2, ¶ 22).

the inventory search. (Dkt. No. 40-2, ¶ 23). Plaintiff disputes that shake was discovered; he cites to conflicting descriptions of where the shake was found and asserts that the Defendants failed to "collect, photograph, or otherwise document" the shake. (Dkt. No. 45-1, ¶ 34). During the inventory search Hairston was taken out of the patrol car for a second search, and Shea found a small baggie with marijuana in Hairston's mouth. (Dkt. No. 45-1, ¶ 35; Dkt. No. 40-2, ¶ 24). According to Defendants, Hairston said that Plaintiff gave him the marijuana. (Dkt. No. 40-2, ¶ 24).[6]

Plaintiff asserts that he "continued to be repeatedly searched by Defendants." (Dkt. No. 45-3, ¶ 15). Plaintiff claims that Defendants told Plaintiff that "they would take him to the hospital for an x-ray, and that they called a canine which would find whatever [he] was hiding." (*Id.* ¶ 15). Plaintiff feared for his safety because of the officers' threats. (*Id.* ¶ 16). After being searched "for what seemed like the dozenth time," Plaintiff said something to the effect of, "again?" to which the trooper searching him responded by saying "it's not like it's because you're black." (*Id.* ¶ 17). While Plaintiff was being detained, he was never told he was free to leave and was never told he was under arrest. (*Id.* ¶ 20).

At approximately 12:00 p.m., Stannard requested a tow truck to have the vehicle removed from the Northway.[7] (Dkt. No. 40-2, ¶ 26; Dkt. No. 45-1, ¶ 24). At some point, Stannard also called Carniglia, who "exclusively worked in narcotic and marijuana detection using a canine

---

[6] Plaintiff now denies giving Hairston marijuana, but there is no indication that he told the officers this. (Dkt. No. 45-3, at ¶ 14).

[7] According to Stannard, the tow truck arrived at approximately 1:45 p.m. and departed the Northway at approximately 2:00 p.m. (Dkt. No. 40-2, ¶¶ 31–32).

drug dog named Dale."[8] (Dkt. No. 41-2, ¶ 9).[9] When Carniglia arrived with Dale, he proceeded to use Dale to inspect the car for narcotics. (Dkt. No. 41-2, ¶¶ 21, 26). With Carniglia leading her, Dale began "an exterior vehicle search" of the Pontiac: Dale "started smelling at the front headlight and worked around the exterior of the car to search for drugs in exterior compartments of the car." (*Id.* ¶ 26). Dale did not alert to any contraband while searching the exterior of the Pontiac. (*Id.*). Carniglia "then opened the passenger side door of [the Pontiac]" and allowed Dale to "search the front passenger seat." (*Id.* ¶ 27). Dale "alerted" to marijuana particles allegedly on the floor of the Pontiac. (*Id.*). Dale also "indicated" at the glove box "by scratching it with her front paws." (*Id.*). During Dale's initial search of the vehicle, she "did not alert or indicate on the front passenger seat." (*Id.* ¶ 28). Following Dale's "indication at the glove box," Carniglia removed Dale from the Pontiac and rewarded her by playing with her and then placed her back in the police vehicle. (Dkt. No. 41-2, ¶ 29; Dkt. No. 43-3, at 42, 47).

Carniglia then searched the glove box where Dale had "indicated" and found no contraband there. (*Id.* at 47–48). Carniglia then retrieved Dale from the police vehicle to search the interior of the Pontiac a second time. (Dkt. No. 41-2, ¶ 32). Dale entered through the passenger door of the Pontiac and "sniffed around the interior in the car." (Dkt. No. 41-2, ¶ 32). Dale alerted to the car's "front passenger seat" and then "indicated on the center of the passenger seat by scratching." (Dkt. No. 41-2, ¶ 32). Dale never searched Plaintiff's person. (Dkt. No. 43-1, at 66).

---

[8] Dale is a German Shepherd "trained in narcotic and marijuana detection." (Dkt. No. 41-2, ¶ 23).

[9] While Stannard states that she "requested a K-9 drug detection unit" at approximately 12:00 p.m., (Dkt. No. 40-2, ¶ 25), the parties agree that it took Carniglia approximately one hour to arrive, and he says that he arrived at approximately 12:00 p.m. (Dkt. No. 45-1, ¶ 39; Dkt. No. 40-5, ¶ 6).

Carniglia then spoke with Plaintiff—although disputed, Defendants claim that still at this point, "Towns was not handcuffed or in custody at the time but was being detained," (Dkt. No. 40-5, ¶ 10)—and "advised him that he had conducted a K-9 search and that the drug dog alerted on the front passenger seat." (Dkt. No. 41-2, ¶ 34; Dkt. No. 43-3, at 58). Carniglia asked Plaintiff if he was in possession of any marijuana or narcotics in his "back pockets or clothing, which [Plaintiff] denied." (Dkt. No. 45-1, ¶¶ 45–46; Dkt. No. 41-2, ¶ 34; Dkt. No. 43-3, at 58).

### C.    The Search of Plaintiff's Person

#### 1.    Defendants' Version

The events that subsequently unfolded are in dispute. According to Defendants, Carniglia "told [Plaintiff] that a search of his person was warranted," based on the dog's alert to the passenger's seat, and that "we would be going to a State Police barracks where he would be thoroughly searched." (Dkt. No. 40-5, ¶ 13). Plaintiff denied having anything and said that he did not want to go to a police station. (*Id.*). Carniglia told Plaintiff, that "if he could show . . . he [was] not in possession of drugs within his clothing, there would be no need to go to a police station," and Plaintiff "volunteered to be searched at the scene." (*Id.*).

Carniglia then "conducted a pat-down search of [Plaintiff's] outer clothing and back pockets, the inside of his legs into his groin area, his front pockets and his waistband." (*Id*. ¶ 14). Carniglia "did not discover" any contraband "during the pat-down." (*Id.*). Carniglia then "opened the front and rear passenger doors on the passenger side of a patrol car creating an area which offered [Plaintiff] appropriate and adequate privacy, entirely shielding him from other members of the [New York State Patrol] and the public during the search." (Dkt. No. 40-5, ¶ 15). He asked Plaintiff "to pull the front of his pants out so that [he] could look down into them. [Plaintiff] complied and in doing so exposed his genitalia to [Carniglia]." (*Id.*). Carniglia "looked down his pants and could see that nothing was concealed in that area." (*Id.*). He then asked Plaintiff "to

turn around so [he] could view [Plaintiff's] back. [Plaintiff] again said he did not have anything" and Carniglia "advised [Plaintiff] that [they] could go to a State Police Station if he would be more comfortable." (*Id.*). According to Carniglia, "[Plaintiff] declined that offer again and continued with the search." (*Id.*).

Carniglia then told Plaintiff "it was necessary" to view "the area of his buttocks, and also the area where his upper legs meet his buttocks. [Plaintiff] first pulled his waistband back and [Carniglia] looked down the back of [Plaintiff's] pants," but Carniglia "could not see the area [he] needed to see." (*Id.*). While Carniglia "did not suspect that Towns had drugs in his anus or rectum," he did suspect drugs were "concealed in his butt cheeks near the anus, the area that would be in proximity to the seat of the car where the dog had alerted." (*Id.*). Plaintiff then "exposed the upper and middle portions of his buttock" but Carniglia could still "not see the area [he] needed to see." (*Id.*). Plaintiff then "put his hands on his butt cheeks and feigned pulling them apart," but Carniglia noticed that Plaintiff was actually "clenching his buttocks together." (*Id.*). Carniglia "told [Plaintiff] to stop clenching and asked him to lean forward." (*Id.*). When Plaintiff leaned forward, Carniglia "saw a bag wrapper concealed in the lower portion of [Plaintiff's]' buttocks, the area near his anus." (*Id.*). Carniglia "advised [Plaintiff] that [he] could see the package and had [Plaintiff] pull his pants back up." (*Id.*). Carniglia "asked [Plaintiff] to remove the package and [Plaintiff] reached down the front of his pants beneath his scrotum and effortlessly removed the package." (*Id.* ¶ 16). Carniglia states that the "package was not in [Plaintiff's] anus or rectum." (*Id.*).

### 2.     Plaintiff's Version

Plaintiff's account of the search differs sharply. According to Plaintiff, Carniglia told Plaintiff that he "was going to check the front and back of [Plaintiff's] underwear." (Dkt. No. 43-1, at 67). Plaintiff "was frightened and asked if [he] had to comply." (Dkt. No. 45-3, ¶ 21; Dkt.

No 43-1, at 73). "A number of State Troopers were near [Plaintiff], and more than one of them simultaneously answered 'yes.'" (Dkt. No. 45-3, ¶ 21; Dkt. No 43-1, at 73). Contrary to Carniglia's version of events, Plaintiff denies being given a choice as to whether to conduct the search at the side of the Northway or at the police station. (Dkt. No. 43-1, at 98). Plaintiff asserts that he "did not physically resist the strip search out of fear that something would happen to [him] if [he] did not submit to it." (Dkt. No. 45-3, ¶ 21). Plaintiff testified that the officers did nothing to provide him with any privacy. (Dkt. 43-1, at 84). With "a lot of traffic going by" on the Northway, (*id.*), Carniglia unbuttoned the front of Plaintiff's pants so that he could "look down the front and rear of [Plaintiff's] pants and at [Plaintiff's] genitalia and buttocks with his flashlight." (Dkt. No. 45-3, ¶ 22). At this point, Plaintiff remained handcuffed with his hands behind his back. (*Id.*). Carniglia then unhandcuffed one of Plaintiff's hands so that Plaintiff "could lif[t] up [his] scrotum and penis with [his] free hand so that he could look into the area of [Plaintiff's] genitals." (*Id.*).

Carniglia then told Plaintiff that he had to pull his pants and underwear down "to an area below [Plaintiff's] knees." (*Id.* ¶ 23). "Because of the number of officers surrounding [Plaintiff] and the fear that they might hit or strike [him]," Plaintiff complied. (*Id.*). Plaintiff felt he "had no choice." (*Id.*). Plaintiff feared that if he did not comply with Carniglia's demands, that he would "be hurt by the defendants and then arrested for resisting arrest." (*Id.*). Plaintiff asserts that Carniglia "was ordering, not asking, me to comply and had said that I had no choice." (*Id.*). Plaintiff was again told to drop his pants to a point right above his knees and to "bend over and lean against one of the State Trooper vehicles, which was parked on the shoulder of the Northway." (*Id.* ¶ 24.). Plaintiff remained in a leaned over position with his hands spreading his buttock cheeks for approximately four or five minutes while Carniglia searched the area between

his buttock cheeks, "as well as [Plaintiff's] rectum and anus." (*Id.* ¶ 26). As Carniglia looked up Plaintiff's buttocks, Carniglia "yelled at [Plaintiff] to bend over further" and made Plaintiff spread his buttock cheeks "from top to bottom so that he could see inside [Plaintiff's] buttocks and up into [his] rectum and anus." (*Id.* ¶ 27).

Carniglia then asked his colleagues for a glove. (*Id.* ¶ 28). Carniglia told Plaintiff "if you make me go in there and get it . . ." which Plaintiff understood to be a threat that if Plaintiff did not remove the object himself, Carniglia would either strike or injure Plaintiff. (*Id.*). Plaintiff replied, "You don't have to go inside me, please just don't hit me." (*Id.*). Feeling "degraded and scared and humiliated," Plaintiff complied. (*Id.* ¶ 29). Plaintiff reached back and pulled a small plastic string attached to a package in his rectum; Plaintiff then placed that package into a bag held by one of the State Troopers. (*Id.*). After withdrawing the package, Plaintiff asked Defendants not to hit him. (*Id.* ¶ 30). The package contained 15 grams of crack cocaine. (Dkt. No. 45-1, ¶ 59).

Defendants then allowed Plaintiff to use the bathroom on the side of the road. (Dkt. No. 45-3, ¶ 31). According to Plaintiff, as he urinated, one of the officers on the scene made jokes about the size of Plaintiff's penis, saying, in substance, "I thought we were supposed to be the white guys." (*Id.*). Plaintiff interpreted this as "a racist joke meant to mean that because [he] was black [he] was supposed to have a large penis." (*Id.*). At another point, Plaintiff's telephone rang. (*Id.* ¶ 18). One of the officers joked that he "was going to answer it and tell the caller that 'your boy got popped' and 'the package isn't coming' in a manner of speech that mocked African American vernacular English." (*Id.*). Plaintiff understood this to be a "racially motivated joke." (*Id.*). Plaintiff felt during his encounter with Defendants that he was treated differently than a white person would have been, including by subjecting Plaintiff to "mean, derogatory racial

jokes and comments throughout [his] arrest." (*Id.* ¶ 33). Defendants each deny discriminating against Plaintiff on account of his race. (Dkt. No. 40-2, ¶ 35; Dkt. No. 40-3, ¶ 21; Dkt. No. 40-4, ¶ 12; Dkt. No. 40-5, ¶ 18; Dkt. No. 40-6, ¶ 17). Towns was arrested and Mirandized at approximately 1:48 p.m., almost four hours after Stannard's initial stop of the Pontiac. (Dkt. No. 45-1, ¶ 61).

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553–54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Emp. & Rest. Emp. Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

## IV.  DISCUSSION

### A.  Plaintiff's Detention

#### 1.  Prolonging the Traffic Stop

Defendants argue that Plaintiff "cannot establish a Fourth Amendment claim based upon an illegal detention because Defendants were justified in detaining Plaintiff at the scene of the traffic stop." (Dkt. No. 40-9, at 14). Plaintiff responds that because, at the time of "Hairston's arrest, there was no reasonable suspicion and no basis to find reasonable suspicion" that Plaintiff was engaging in criminal activity, his detention was illegal. (Dkt. No. 45, at 3–4). Citing to *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), Plaintiff asserts that he "should have been allowed to leave the scene or be transported off the Northway . . . instead of being handcuffed and detained and subjected to hour's long searches." (Dkt. No. 41-3, at 6). The Court finds that summary judgment is not warranted for Plaintiff or Defendants because there are material issues of fact as to the reasonableness of the duration and scope of the stop.

The Fourth Amendment "guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States*

*v. Gomez*, 877 F.3d 76, 85–86 (2d Cir. 2017) (quoting U.S. Const. amend. IV) (alteration in original). Traffic stops constitute the "seizure of persons within the meaning of [the Fourth Amendment]." *Gomez*, 877 F.3d at 86 (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). "Therefore, traffic stops must satisfy the Fourth Amendment's reasonableness limitation, which 'requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity.'" *Id.* (quoting *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009)). However, a stop that is "reasonable at its inception . . . can violate the Fourth Amendment if it is 'prolonged beyond the time reasonably required to complete that mission.'" *Id.* "[T]asks not related to the traffic mission, such as dog sniffs or on-scene investigations into other crimes, are unlawful if they prolong the stop absent independent reasonable suspicion." *Id.* at 89 (internal quotation marks omitted). In *Gomez*, the Second Circuit held that the law enforcement officers' "investigative inquiries" concerning drugs and firearms during a five-minute stop for traffic violations prolonged the stop in violation of the Fourth Amendment. *Id.* at 90–91.

As an initial matter, Plaintiff concedes the Pontiac Hairston was driving "may have been a few miles [per hour] . . . above the speed limit." (Dkt. No. 43-1, at 100–01). Thus, the undisputed evidence shows that when stopping the Pontiac, Stannard had probable cause to believe a traffic violation had occurred. *See Whren*, 517 U.S. at 810 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Beyond determining whether to issue a traffic ticket, "an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). Typically, such inquiries

"involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*

Here, when Stannard ran Hairston's information, she discovered that Hairston's "license was suspended," which accordingly gave Stannard probable cause to arrest Hairston for aggravated unlicensed operation of a motor vehicle. (Dkt. No. 45-1, ¶ 9; Dkt. No. 40-2, ¶ 11). *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Upon discovering that Plaintiff did not have a license[10] and could not drive the Pontiac from the Northway, Defendants were entitled to take the car into custody and conduct a corresponding inventory search. *United States v. Williams*, 930 F.3d 44, 53 (2d Cir. 2019) ("The Supreme Court has long recognized that when police 'take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct.'" (quoting *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008))). Accordingly, Stannard then requested assistance from New York State Troopers. (Dkt. No. 45-1, ¶¶ 18–19, 24).

Shea, Mallory, and Maybaum responded to Stannard's request for assistance. (Dkt. No. 45-1, ¶ 27). Stannard and Shea arrested and searched Hairston. (*Id.* ¶¶ 30, 32). At this point, Plaintiff challenges his continued detention, arguing that he should have been "transported off the Northway." (Dkt. No. 45, at 3). The Court disagrees. A traffic stop is reasonable for the

---

[10] Plaintiff asserts that Defendant "inappropriately ran" his non-driver identification. (Dkt. No. 45-1, at 7). The record does not reflect whether that prolonged the stop, and the parties have not briefed the issue of background checks on a passenger during a traffic stop. *See United States v. Hicks*, No. 18-cr-6041, 2018 WL 6595934, at *7, 2018 U.S. Dist. LEXIS 212055, at *22–24 (W.D.N.Y. Dec. 14, 2018) (citing caselaw regarding inquiries and background checks on passengers).

amount of time it takes to complete "the seizure's mission—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez*, 135 S.Ct. at 1614. The passengers may be detained for the duration of a valid traffic stop, including a "pending inquiry into a vehicle violation." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Here, it is undisputed that Plaintiff could not legally drive the Pontiac; as a result, it had to be inventoried and towed. The mission of the traffic stop, therefore was not complete until those tasks were completed. *See United States v. Gurule*, 935 F.3d 878, 884 (10th Cir. 2019), *as revised* (Oct. 10, 2019) (explaining that where "[n]one of the vehicle's occupants possessed a valid driver's license . . . the efforts on the part of law enforcement to help locate a licensed driver cannot be characterized as unconstitutionally extending this traffic stop."); *United States v. Yancey*, 928 F.3d 627, 631 (7th Cir. 2019) (finding detention during traffic stop reasonable where officers "had yet to verify if [the defendant] had a valid driver's license and could legally drive the car"); *United States v. Vargas*, 848 F.3d 971, 974 (11th Cir. 2017) (finding officer's attempts to find a licensed driver for a vehicle that the occupants could not drive were taken in the lawful discharge of his duties," and "fairly characterized as part of [his] traffic mission." (citing *Rodriguez*, 135 S.Ct. at 1615)).

At the time of Hairston's arrest for traffic violations, Plaintiff also argues that there was not reasonable suspicion to prolong the stop. Reasonable suspicion is relevant to the extent that the stop was prolonged for reasons unrelated to the seizure's mission—the traffic violations—in the approximately 35-40-minute period after the arrival of the officers, and before the 11:15 a.m. inventory search.[11] Plaintiff argues that there was no inconsistency between his and Hairston's statements regarding their trip to Vermont. Plaintiff denies that they had provided no reason for

---

[11] The Court cannot assess whether the stop was prolonged beyond the traffic mission after Hairston's arrest and before the inventory search because the record does not reflect what happened in that time period.

the trip; and argues that the fact that Hairston did not know their destination in Vermont, and the two did not appear to know each other well was insufficient to constitute reasonable suspicion of criminal activity. The Court finds that there are triable issues of fact as to whether Plaintiff and Hairston's statements sufficed to give Defendants the "reasonable articulable suspicion" that criminal activity was afoot necessary to prolong the stop. *Compare United States v. Restrepo*, 890 F. Supp. 180, 195 (E.D.N.Y. 1995) (declining to credit officer's testimony about "perceived inconsistencies" in driver and passenger's stories) *with United States v. Tehrani*, 49 F.3d 54, 59 (2d Cir. 1995) (finding reasonable suspicion existed where, *inter alia*, the defendant's "answers were inconsistent with the answers of his known travelling companion")

The length of time between the inventory search and the end of the stop would appear to fall within the legitimate scope of an investigatory stop supported by reasonable suspicion, and then probable cause. Defendants found marijuana when they searched Hairston for a second time during the inventory search, which Hairston attributed to Plaintiff. (Dkt. No. 45-1, ¶ 35). The odor of marijuana in the vehicle and the presence of marijuana in Hairston's mouth then made it reasonable for Carniglia to conduct a dog sniff of the Pontiac. *See United States v. Green*, No. 14-cr-6038, 2018 WL 1136928, at *3, 2018 U.S. Dist. LEXIS 34640, at *8–9 (W.D.N.Y. Mar. 2, 2018) (finding it reasonable to "conduct a dog sniff" where an officer noticed an "overwhelming smell of marijuana emitting from the vehicle"). At this point, even considering the facts in the light most favorable to Plaintiff, Defendants had "develop[ed] a reasonable suspicion of criminal activity supported by specific and articulable facts."[12] *United States v. Gomez*, 751 F. App'x 63, 67 (2d Cir. 2018) (quoting *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015)). During

---

[12] Accordingly, the Court finds unavailing Plaintiff's arguments that there was "a total lack of probable cause to continue searching Mr. Hairston's vehicle," (Dkt. No. 41-3, at 13), and that it was improper to detain Plaintiff in "[D]efendant Mallory's . . . vehicle" for "30 . . . to 45 minutes." (*Id.* at 12).

Dale's search of the Pontiac, she alerted to the car's "front passenger seat" and then "indicated on the center of the passenger seat by scratching." (Dkt. No. 45-1, ¶ 43). This, together with the marijuana found Hairston's mouth that he attributed to Plaintiff, Dale's alert to the car glove box, marijuana shake in the vehicle, and the odor of marijuana would appear to have given Carniglia probable cause to believe that Plaintiff was engaged in criminal activity, and that Plaintiff was hiding narcotics or marijuana.[13] When pat-downs revealed no contraband, Defendants appear to have had probable cause that the contraband may be secreted on or in Plaintiff's body.

There are, however, material factual issues with respect to the duration of the stop because the record does not reflect what happened in the time period after Hairston's arrest and before the inventory search, and because there are triable issues of fact as to whether the Defendants had reasonable suspicion of criminal activity at this time.

### 2. The Scope of Plaintiff's Detention

The Court also finds that Plaintiff's assertions regarding the use of handcuffs and repeated patfrisks raise triable issues of fact relating to the scope of Plaintiff's detention.[14] Whether the use of handcuffs is reasonable during an investigatory stop "demands a careful consideration of the circumstances in which [the] challenged restraints were used." *United States v. Bailey*, 743 F.3d 322, 339–40 (2d Cir. 2014). "The relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." *Id.* at 340. The

---

[13] The Court recognizes that Plaintiff seeks to challenge the dog alert, and this decision does not preclude Plaintiff from doing so. (Dkt. No. 45-1, at 17–20). At the same time, the Court recognizes that "a court can presume (subject to any conflicting evidence offered) that a [certified] dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 247 (2013).

[14] Although the record is not clear as to when all of the alleged patfrisks occurred. Plaintiff testified that he was subjected to "[o]ver ten" patfrisks before Carniglia arrived at the scene of the traffic stop. (Dkt. No. 43-1, at 48–49). Defendants have not responded to the allegation of repeated patfrisks. In any event, the Court finds a material issue of fact with respect to the use of handcuffs.

determinative "question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it." *Bailey*, 743 F.3d at 340 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

Although "handcuffs are not ordinarily part of a traffic stop, [handcuffs] may be reasonable where the officer suspects the target of the stop to be armed and dangerous." *Ramdath v. Favata*, No. 11-cv-0395, 2014 WL 12586843, at *7, 2014 U.S. Dist. LEXIS 196540, at *21 (N.D.N.Y. July 23, 2014); *see also Johnson*, 555 U.S. at 327 ("To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.").

Here, according to Plaintiff, he was handcuffed at the side of the Northway after Hairston "was placed under arrest" for traffic infractions. (Dkt. 45-3, at ¶ 13). Multiple officers were on the scene, and Plaintiff asserts that Defendants "searched [him] repeatedly." (*Id.* at ¶ 12). On the other hand, Mallory, who stayed with Towns during the inventory search, and Carniglia, who conducted the strip search and visual body cavity search, both state that Plaintiff was not handcuffed. (Dkt. No. 40-6, ¶¶ 9–10; Dkt. No. 40-5, ¶ 12). Defendants have not argued that the scope of the detention was warranted if, as Plaintiff claims, he was handcuffed from the time he was placed in Mallory's car. Accordingly, the Court finds a material dispute of fact as to whether Defendants "exceeded the permissible scope of a *Terry* stop." *See Bailey*, 743 F.3d at 332.

Because material issues of fact remain with respect to the duration and scope of Plaintiff's detention, the Court denies both parties' motions for summary judgment as to this claim.

## B. The Search of Plaintiff

### 1. The Type of Search Conducted at the Side of the Northway

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam); *Katz v. United States*, 389 U.S. 347, 357 (1967)). Moreover, "warrantless searches are per se unreasonable, subject only to a few specifically delineated and well-recognized exceptions." *New Jersey v. T.L.O.*, 469 U.S. 325, 354 (1985).

To determine whether the search conducted here was reasonable, the Court, as a preliminary matter, considers the kind of search that occurred. The classification is important because more intrusive searches are subject to a stricter standard. *Monroe v. Gould*, 372 F. Supp. 3d 197, 205 (S.D.N.Y. 2019); *see also People v. Hall*, 10 N.Y.3d 303, 309 (2008).

Defendants argue that the search here "was not an actual strip search involving the complete removal of any items of clothing" and that none of the Defendants "touched Plaintiff during the search." (Dkt. No. 40-9, at 16). Plaintiff, by contrast, argues that the search performed here rises to the level of a "manual body cavity search" because Defendants made Plaintiff "bend over and spread his buttock cheeks," and retrieve a package from his rectum. (Dkt. No. 45, at 25–26). That is, according to Plaintiff, because Plaintiff was acting at Defendant's direction it is immaterial whether any of the defendants actually touched him and that the search should therefore be considered a manual cavity search. (*Id.*). The Court notes that there is a disputed

issue of fact as to whether the package of crack cocaine was in the cheeks of Plaintiff's buttocks or in his anal cavity (*See* Dkt. No. 45-3, ¶¶ 2, 4; Dkt. No. 40-5, ¶ 15). [15]

In any event, it appears based on the undisputed evidence that Carniglia performed a strip search and a "visual body cavity search." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013). "[A] 'strip search' occurs when a suspect is required to remove his clothes." *Id.* A visual body cavity search "is one in which the police observe the suspect's body cavities without touching them." *Id.* The search is best classified as a visual cavity search even where, as here, the officers instruct the plaintiff to take certain actions. *Id.* (explaining that a search is a visual body cavity search where officers "hav[e] a suspect" bend over or squat and cough (citing *Hall*, 10 N.Y.3d at 306–07)). At least one court has found that a search is a visual body cavity search where an officer instructs a person to remove something from his buttocks. *See United States v. Awer*, No. 06-cr-061S, 2007 WL 172258, at *2, 6–7, 2007 U.S. Dist. LEXIS 5175, at *4–5 (D. R.I. Jan. 23, 2007) (classifying a search as a "visual body cavity search" where an officer "ordered Defendant to remove" from his buttocks a bag containing cocaine), *aff'd*, 770 F.3d 83 (1st Cir. 2014). The Second Circuit has explained that a manual body cavity search requires "some degree of touching or probing of body cavities." *Harris v. Miller*, 818 F.3d 49, 58 (2d Cir. 2016) (per curiam) (quoting *Cookish v. Powell*, 945 F.2d 441, 445 (1st Cir. 1991)). The distinguishing feature between a visual body cavity search and a manual body cavity search is whether the "the police put anything into a suspect's body cavity, or take anything out."

---

[15] Plaintiff asserts that before leaving the Bronx he "inserted a package" into his rectum which contained "several pieces of crack/cocaine pressed together in a small, oval shape." (Dkt. No. 45-3, ¶¶ 2–3). These pieces were placed into a "plastic sandwich bag" that Plaintiff "wrapped . . . tightly around the crack/cocaine and doubled over the bag in a way that formed a small oval shaped plastic package that was approximately two inches long. (*Id.* ¶ 3). Plaintiff then cut a separate plastic sandwich bag to create a "plastic strip like a string," which he wrapped around the initial package to "hold it together." (*Id.*). Plaintiff "inserted the package approximately 3 inches into [his] rectum so that only a very small piece of the plastic string stuck out from his anus." (*Id.* ¶ 4).

*Gonzalez*, 728 F.3d at 158; *Kelsey v. Cty. of Schoharie*, 567 F.3d 54, 62 (2d Cir. 2009) ("[A] 'manual body-cavity search' is a strip search that involves a naked body examination, including a viewing of the genitals and anus, by touching or probing with an instrument.").[16]

## 2. Whether Plaintiff Consented to the Search

"So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search" and does not violate the Fourth Amendment. *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Garcia*, 56 F.3d at 423 (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)) Defendants argue that Plaintiff consented to what they describe as the "limited search of his person." (Dkt. No. 40-9, at 23). Plaintiff counters that he "did not consent to the search of his body cavities, and only acquiesced in the search out of intimidation, fear, and coercion." (Dkt. No. 45, at 10).

"Whether an individual has consented to a search is a question of fact to be determined by the 'totality of all the circumstances.'" *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Consent must be "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Id.* (citations omitted). Consent "may be granted either explicitly or implicitly, and it may be inferred from an individual's words, gestures, or conduct." *United*

---

[16] Defendants argue that the search conducted here "was not an actual strip search involving the complete removal of any items of clothing, but simply that Plaintiff moved his pants and underwear in order to allow [Defendant] Carniglia to view first his genitalia and then his buttocks." (Dkt. No. 40-9, at 18). The Court agrees with Plaintiff that it is immaterial that Plaintiff was required only to pull his pants and underwear to knee level. (*See* Dkt. No. 45, at 7; Dkt. No. 45-3, ¶ 24). "[P]eering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy." *Harris*, 818 F.3d at 58 (quoting *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 566 U.S. 318, 344–45 (2012) (Breyer, J., dissenting)).

*States v. Wilson*, 914 F. Supp. 2d 550, 558 (S.D.N.Y. 2012) (citing *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981)). "[K]nowledge of the right to refuse consent is one factor to be taken into account" when determining whether consent was voluntarily given. *Schneckloth*, 412 U.S. at 227; *see also United States v. Drayton*, 536 U.S. 194, 206–07 (2002). Other relevant factors include "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained . . . and whether the defendant previously had refused to consent." *United States v. Eggers*, 21 F. Supp. 2d 261, 268–69 (S.D.N.Y. 1998).

Here, there are disputed issues of fact as to whether Plaintiff consented to the search. On Plaintiff's account, by the time of Carniglia's search, he had been "subjected to repeated searches of [his] person," detained, and handcuffed for hours. (Dkt. No. 45-3, at ¶ 20). When asked to consent to the search, Plaintiff asked whether he "had to comply," and more than one of the officers surrounding Plaintiff simultaneously answered "yes." (Dkt. No. 45-3, at ¶ 21). Courts have noted that when police "represent[] . . . that they have authority to search whether or not [the suspect] consents, a permissive statement by the defendant cannot be deemed a voluntary consent." *United States v. Sanchez*, 635 F.2d 47, 59 (2d Cir. 1980) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

Defendants, on the other hand argue that Plaintiff consented to the search at the side of the Northway rather than going to the police station. (Dkt. No. 47, at 8). Although Carniglia states that he told Plaintiff that, Plaintiff "would be going to a State Police barracks where he would be thoroughly searched," Carniglia also informed Plaintiff that a search was warranted because of the dog alert on the passenger seat. (Dkt. No. 40-5, ¶ 13). Whether these statements were coercive under these circumstances here is a factual issue for the jury. *See, e.g., United*

*States v. Munoz*, 987 F. Supp. 2d 438, 445 (S.D.N.Y. 2013) (distinguishing "truthful advice about the likely sequence of events," which does not vitiate consent, from a statement that "becomes coercive because it wrongly suggests that a search is inevitable"); *see also United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974) (explaining that, where there "were grounds for the issuance of a search warrant" "the well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion . . . There was in fact, here, a fair and sensible appraisal of the realities facing the defendant"). Carniglia further explained that with the use of the police car doors, he gave Plaintiff as much privacy as possible, and when it appeared Plaintiff may have been withdrawing his consent, Carniglia made sure that Plaintiff wished to proceed with the search. (Dkt. No. 40-5, ¶ 15).

Accordingly, the Court finds material disputes of fact as to whether Defendants had "a reasonable basis for believing that there had been consent to the search." *Garcia*, 56 F.3d at 423. These material issues of fact preclude summary judgment on this issue for either party.

      **3.**       **The Constitutionality of the Warrantless Strip Search and Visual Body Cavity Search During an Investigatory Stop**

      **a.**       **The Applicable Standard**

Court have recognized the highly intrusive and degrading nature of the search conducted here. *See Sloley v. Vanbramer*, No. 16-4213, 2019 WL 6765762, at *5, 2019 U.S. App. LEXIS 36733, at *14 (2d Cir. Dec. 12, 2019) (noting that strip searches are "uniquely intrusive" and the "invasive and degrading" nature of visual body cavity searches, which are "even more intrusive"). Recently the Second Circuit ruled that a visual body cavity search *incident to arrest* "must be based on reasonable suspicion to believe that the arrestee is secreting evidence inside the body cavity to be searched." *Id.* at *6.

Defendants have not cited any authority concerning the reasonableness of a warrantless strip search or visual body cavity search of an individual who is not under arrest but only detained in an investigatory stop. The caselaw analyzing such searches of suspects who are only detained—as opposed to arrested or incarcerated—is sparse. [17] *See e.g.*, *Turner v. Taylor*, No. 09-cv-02858, 2011 WL 3794086, at *6, 2011 U.S. Dist. LEXIS 95758, at *14 (D.S.C. Aug. 25, 2011) (ruling that officers would have to establish exigent circumstances and probable cause to conduct warrantless strip searches of occupants of vehicle who were not under arrest); *Foster v. City of Oakland*, 621 F. Supp. 2d 779, 791 (N.D. Cal. 2008) (ruling that officers in the field may only perform strip searches or visual body cavity searches on persons who have been lawfully arrested when there are exigent circumstances and there is probable cause to believe that "the arrestee is in possession of weapons, drugs or dangerous contraband"); *Gray ex rel. Gray v. City of Columbus*, No. 98-cv-1395, 2000 WL 683394, at *10, 2000 U.S. Dist. LEXIS 7207, at *29 (S.D. Ind. Jan. 31, 2000) (denying summary judgment to officers who conducted a strip search and body cavity search of an occupant of a vehicle with marijuana, noting that "outside of the context of a border search, the defendants have not offered any case authority even suggesting that police may carry out a strip search and body cavity search of an individual not under arrest").

As noted above, it would appear that, even viewing the evidence in the light most favorable to Plaintiff, the dog alert on the front passenger seat gave Defendants probable cause to believe Plaintiff was secreting narcotics or marijuana on or in his body. (Dkt. No. 41-2, ¶ 23).

---

[17] This case does not involve the institutional security concerns underlying searches of inmates at correctional facilities or arrestees committed to correctional facilities. *See, e.g., Florence*, 566 U.S. at 330 ("Correctional officials have a significant interest in conducting a thorough search," including a strip search, "as a standard part of the intake process."); *Bell v. Wolfish*, 441 U.S. 520, 560 (1979) ("Balancing the significant and legitimate security interests of [a jail] against the privacy interests of the inmates, we conclude that" "visual body-cavity inspections" may sometimes be conducted "on less than probable cause.").

Defendants have not argued that there were exigent circumstances here; they assert that they only needed probable cause. However, the Court notes that in addition to the material issue of fact as to whether the Plaintiff consented to the search there are, as described below, material issues of fact as to whether the manner and place in which the search was conducted was reasonable. *Wilson v. Aquino*, 233 F. App'x 73, 76 (2d Cir. 2007) ("Assuming defendants lawfully arrested [the plaintiff], the reasonableness of any search incident thereto still depended on the manner in which it was conducted."). In light of the material factual issues regarding this search, and the parties' failure to address the applicable standard, the Court does not now rule on the justification required for such a search.

### b. The Reasonableness of the Manner and Location of the Search

Even if there were adequate justification for the search there are material disputes of fact as to whether the search was conducted "in an unreasonable manner or at an unreasonable location." *Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 80 (D. Conn. 2016). Determining whether a search is reasonable requires balancing "the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

A strip search "in a public place, even if justified by reasonable suspicion, has been uniformly subject to close scrutiny, and has generally required a clear showing of exigent circumstances to justify such an extreme invasion of privacy." *Cotto*, 158 F. Supp. 3d at 80; *see also Illinois v. Lafayette*, 462 U.S. 640, 645 (1983) (observing that "the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street"); *Moore v. Hearle*, 639 F. Supp. 2d 352, 357 (S.D.N.Y. 2009) ("While pulling back someone's pants to inspect the inside of their pants in public has been found reasonable, a partial strip search in a

public place where passersby can see a person's naked body is not reasonable absent serious safety concerns.") (citations omitted); *Campbell v. Miller*, 499 F.3d 711, 719 (7th Cir. 2007) (collecting cases and noting that "[c]ourts across the country are uniform in their condemnation of intrusive searches performed in public"); *Polk v. Montgomery Cty.*, 782 F.2d 1196, 1201–02 (4th Cir. 1986) ("[Whether the strip search was conducted in private] is especially relevant in determining whether a strip search is reasonable under the circumstances."); *Jean-Laurent v. Hennessy*, No. 05-cv-1155, 2008 WL 3049875, at *14, 2008 U.S. Dist. LEXIS 59478, at *48–49 (E.D.N.Y. Aug. 1, 2008) (denying summary judgment for officers when the plaintiff alleged he was "strip searched . . . in the street in front of several witnesses").

Here, even viewing the evidence in the light most favorable to Defendants, there are material issue of fact. Since Plaintiff denies being given a choice to do the search at the police barracks, (Dkt. No. 43-2, at 98), there are factual disputes as to whether the search occurred in a reasonable place. Defendants have not argued that there were exigent circumstances. They do not maintain, for instance, that they feared Plaintiff would destroy the contraband in his possession. *See Wilson*, 233 F. App'x at 76 (finding no exigent circumstances justified "a need to transport [the plaintiff] to a private office location rather than to the police precinct to conduct any further search"). The Second Circuit has held that "in some circumstances, police may transport a suspect short distances in aid of a *Terry* stop." *United States v. McCargo*, 464 F.3d 192, 198 (2d Cir. 2006).

Carniglia states that he conducted the search after creating a space between the open front and rear passenger doors of a patrol car, "entirely shielding" Plaintiff from the other officers and the public. (Dkt. No. 40-5, ¶ 15). Plaintiff, on the other hand, denies that doors were opened to give him privacy. (Dkt. No. 43, at 84). On Plaintiff's account, Plaintiff was "surrounded" by

"[f]our State Troopers" during the search, (Dkt. No. 45-3, ¶ 25), on the "shoulder of the Northway." (*Id.* ¶¶ 24-25). Plaintiff testified that the officers did not give him any privacy and that there was "a lot of traffic" passing by. (Dkt. No. 43-1, at 84). Accordingly, the Court finds material issues of fact as to whether the visual body cavity search of Plaintiff was conducted in an "unreasonable location" and in "an unreasonable manner." *Cotto*, 158 F. Supp. 3d at 80. Both parties' summary judgment motions are denied as to this claim.

### C. Equal Protection Racial Discrimination Claim

Defendants seek summary judgment on Plaintiff's equal protection claim. The Fourteenth Amendment's Equal Protection Clause mandates that all persons "similarly situated . . . be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To establish a violation of equal protection based upon selective enforcement, a plaintiff may show that he was (1) selectively treated as compared with others similarly situated and (2) that such selective treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Latrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Alternatively, a Plaintiff may show "that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001).

Here, Plaintiff argues that he was "subjected to racial comments suggesting that the defendant State Troopers were engaged in a racially motivated traffic stop." (Dkt. No. 45, at 15). He argues first that he was subject to racial discrimination when the Pontiac was pulled over. (*Id.* at 14–15). Plaintiff also argues that he was subject to impermissible racial discrimination during

the subsequent search of his person when Defendants allegedly made racially derisive remarks. (*Id.* at 16). The Court analyzes each in turn.

### 1.    Racial Discrimination Leading to the Traffic Stop

Defendants argue summary judgment is proper because "there is no factual support for Plaintiff's allegation that Trooper Stannard stopped the Pontiac because [Plaintiff] and [Hairston] are African American." (Dkt. No. 40-9, at 20). In response, Plaintiff cites statistics indicating that "African Americans are arrested and prosecuted for drug offenses at hugely disproportionate rates than Caucasians." (Dkt. No. 45).

The Court finds Plaintiff's evidence as to the traffic stop itself insufficient to avoid summary judgment. Plaintiff offers "no evidence indicating that [Hairston's] car was selectively stopped over other vehicles traveling" on the Northway and moreover, "there is nothing in the record demonstrating that [Stannard] pulled [Hairston] over because of an impermissible consideration." *Gonzalez v. City of New York*, No. 99-cv-9128, 2000 WL 1678036, at *4, 2000 U.S. Dist. LEXIS 16153, at *14 (S.D.N.Y. Nov. 8, 2000), *aff'd*, 38 F. App'x 62 (2d Cir. 2002). Moreover, courts in this Circuit have granted summary judgment where, as here, a plaintiff relies on statistical evidence external to his case to show discriminatory intent. *See Miller v. Terrillion*, 391 F. Supp. 3d 217, 223–24 (E.D.N.Y. 2019) (granting defendants summary judgment where the plaintiff drew "on a 2013 decision . . . in which the plaintiff's there established through statistical . . . evidence 'that the NYPD implements its policies regarding stop and frisk in a manner that intentionally discriminates based on race.'" (quoting *Floyd v. City of New York*, 959 F. Supp. 2d 540, 663 (S.D.N.Y. 2013))). That evidence fails to establish that *in this case* "the traffic stop was motivated by discriminatory intent." *Id.* at 225. Moreover, apart from this statistical evidence, Plaintiff cites no caselaw to support his racial discrimination claim as to the

stop. Accordingly, the Court finds summary judgment appropriate on his equal protection claim as to the traffic stop itself.

### 2. The Alleged Racial Comments During the Traffic Stop

Plaintiff also argues that he was "subjected to racial comments suggesting that the defendant State Troopers were engaged in racially motivated traffic stop and treated differently because of his race." (Dkt. No. 45, at 15). Plaintiff cites three instances during the traffic stop. First, upon questioning why he was being repeatedly searched, Plaintiff alleges that the State Trooper searching him responded, "It's not like it's because you're black." (Dkt. No. 45, at 16; Dkt. No. 45-3). Second, Plaintiff asserts that a State Trooper "mimic[ed], mock[ed], or otherwise made fun of African American Vernacular English" when Plaintiff's phone rang and the State Trooper joked that he would answer it telling the caller that "your boy got popped," and "the package isn't coming." (*Id.*). Finally, Plaintiff alleges that Investigators made comments regarding the size of his penis as he was urinating at the end of the traffic stop.[18] (*Id.*). In reply, as to the first comment, Defendants argue that a literal reading of the statement is "actually a denial that race played any part in the decision to frisk Plaintiff." (Dkt. No. 47, at 10). As to the other two events, Defendants state that these comments "fail[] to rise to the level of an actionable offense." (*Id.*).

"[V]erbal harassment alone does not amount to a constitutional deprivation." *Ali v. Connick*, 136 F. Supp. 3d 270, 276 (E.D.N.Y. 2015) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (holding that name-calling without "any appreciable injury" did not violate a prisoner's constitutional rights)). While racially-charged language may be considered in assessing the reasonableness of a search, *see*, *e.g.*, *Evans v. Stephens*, 407 F.3d 1272, 1281-82

---

[18] Plaintiff does not identify which officer(s) allegedly made any of these comments.

(11th Cir. 2005); *Cotto*, 158 F. Supp. 3d at 80, "[m]ere verbal abuse or the use of racial slurs or epithets reflecting racial prejudice, although reprehensible, does not form the basis of a claim pursuant to [Section] 1983," *Baskerville v. Goord*, No. 97-cv-6413, 2000 WL 897153, at *3, 2000 U.S. Dist. LEXIS 9242, at *10 (S.D.N.Y. July 6, 2000). Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's equal protection claim.

### D.    Qualified Immunity[19]

Defendants claim they are entitled to qualified immunity, arguing that "it cannot be said that <u>no</u> reasonable officers in Defendants' positions could have believed that the search of Plaintiff at the scene of the traffic stop was appropriate." (Dkt. No. 40-9, at 20–23). Plaintiff counters that it was clearly established that a warrant was required to remove the internally secreted package from Plaintiff. (Dkt. No. 45, at 19–26).

At the summary judgment stage, claims of qualified immunity are evaluated "using a two-part inquiry: (1) whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a federal right" and (2) whether the right in question was clearly established at the time of the violation." *Sloley*, 2019 WL 6765762 at *4, 2019 U.S. App. LEXIS 36733, at *10–11 (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). The Court has discretion to decide which of the two prongs should be addressed first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Under either prong of the qualified immunity analysis, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656.

---

[19] The Court does not consider whether Defendants are entitled to qualified immunity for Plaintiff's illegal detention claim because Defendants only raise qualified immunity with respect to Plaintiff's visual body cavity search. (*See* Dkt. No. 40-9, at 18–21); *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) ("The qualified immunity defense can be waived, either by failure to raise it in a timely fashion, or by failure to raise it with sufficient particularity.").

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'"[20] *D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). While there need not be "'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Id.* at 590 (quoting *al–Kidd*, 563 U.S. at 741–42); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). The focus is on "whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct.1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

The question here, then, is whether it was clearly established on September 8, 2014, that an officer could not conduct a visual body cavity search, with probable cause but without a warrant or exigent circumstances, of a suspect who was not under arrest, in view of others on the side of the road during a traffic stop.

Courts both in this Circuit and across the country agree with the following two propositions: first, a strip search violates the Fourth Amendment if it is conducted in an unreasonable place and manner. *Wilson v. Aquino*, 233 F. App'x 73, 76 (2d Cir. 2007) (denying qualified immunity and holding that it was "objectively unreasonable for the defendants to think that their . . . method of conducting the challenged strip search was lawful"). Second, that "it is

---

[20] The Second Circuit recently reminded that "[o]ut-of-circuit caselaw is relevant to the qualified immunity analysis only where the cases 'clearly foreshadow a particular ruling on the issue.'" *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019) (quoting *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (internal quotation marks and citation omitted)). The Court finds that in this case out-of-circuit caselaw does just that.

unreasonable to conduct a strip search in full view of the public without exigent circumstances." *Cotto*, 158 F. Supp. 3d at 85–86; *see also, e.g.*, *Lafayette*, 462 U.S. at 645 (explaining, in the context of the search of an "arrestee's person," that "[p]olice conduct that would be impractical or unreasonable—or embarrassingly intrusive—on the street can more readily—and privately— be performed at the station."); *Campbell*, 499 F.3d at 718 (finding search incident to arrest was conducted in an unreasonable manner where "[h]aving decided, legitimately, to conduct this type of search, the police inexplicably did not even afford [the plaintiff] the dignity of doing it in a private place"); *Hill v. Bogans*, 735 F.2d 391, 393–94 (10th Cir. 1984) (finding the manner of a strip search of an arrestee unreasonable where it was conducted in a police station lobby area with "ten to twelve people . . . milling about"); *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981) ("We think that, as a matter of law, no police officer in this day and time could reasonably believe that conducting a strip search in an area exposed to the general view of persons known to be in the vicinity whether or not any actually viewed the search is a constitutionally valid governmental invasion of (the) personal rights that (such a) search entails.") (quoting *Bell*, 441 U.S. at 559).

Moreover, district courts in this Circuit have denied qualified immunity when confronted with unreasonable strip searches of *arrestees* in public.[21] *See, e.g.*, *Cotto*, 158 F. Supp. 3d at 85– 86; *Moore*, 639 F. Supp. 2d 352 at 357 ("[A] partial strip search in a public place where passersby can see a person's naked body is not reasonable absent serious safety concerns."); *Jean-Laurent*, 2008 WL 3049875, at *17, 2008 U.S. Dist. LEXIS 59478, at *56.

---

[21] In *Sloley*, the recent strip search case cited above, the Second Circuit noted that "'decisions of other federal lower courts[] are relevant and often persuasive' authority on the 'clearly established' issue." *Sloley*, 2019 WL 6765762, at *7–8, 2019 U.S. App. LEXIS 36733, at *21–23 (quoting *Charles W. v. Maul*, 214 F.3d 350, 357 (2d Cir. 2000)).

Here, Plaintiff was not under arrest when he was searched. The line of cases finding Fourth Amendment violations as applied to arrestees subject to intrusive searches would have given any reasonable officer fair notice that a visual body cavity search in the manner allegedly conducted here violated Plaintiff's clearly established constitutional rights. *See Edrei v. Maguire*, 892 F.3d 525, 540, 542-43 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2614 (2019) (explaining that qualified immunity's "fair notice" requirement can be met in novel factual contexts). Accordingly, the Court denies qualified immunity as to the strip and visual body cavity search at this stage.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 40) is **GRANTED** as to Plaintiff's equal protection claim (Ninth Claim); and it is further

**ORDERED** that Plaintiff's equal protection claim (Ninth Claim) is **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 41) is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated: December 20, 2019
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge